**INDIANA BELL TELEPHONE COMPANY, INCORPORATED, Appellant (Defendant Below),**

v.

**Michael O'BRYAN d/b/a Indianapolis Beauty College, Appellee (Plaintiff Below).**

No. 2-1077A395.

Court of Appeals of Indiana, Second District.

July 31, 1980.

Bruce N. Cracraft and Shannie Bibie, Indianapolis, for appellant.

Robert A. Garelick and William M. Pope, Maurer, Garelick, Cohen & Frank, Indianapolis, for appellee.

BUCHANAN, Chief Judge.

### CASE SUMMARY

Appellant-defendant Indiana Bell Telephone Company, Inc. (Bell) appeals from a judgment for Michael O'Bryan (O'Bryan) d/b/a Indianapolis Beauty College, claiming the trial court admitted improper evidence, allowed recovery on tort and contract for a single wrong, ignored tariff restrictions on liability, that the judgment was contrary to law and the evidence was insufficient to sustain the decision.

We affirm in part and reverse in part.

### FACTS

The evidence most favorable to the judgment is that:

In July, 1972, O'Bryan opened the Indianapolis Beauty College (College). He contacted Bell to secure listings in the white

and yellow pages of the Indianapolis telephone directory.

During his conversations with one of Bell's sales representatives, he was assured that directory assistance was one of the benefits to be gained by the purchase of this service. O'Bryan emphasized that due to the number of out-of-town calls in the beauty college business, this assistance was crucial.

In March, 1973, O'Bryan became aware that there was difficulty in receiving the College's number through directory assistance, although at all times the number was correctly listed in the white and yellow pages directories. When O'Bryan called, he was informed by an operator and her supervisor that no number for the college existed. In late spring, 1973, O'Bryan informed Bell of repeated difficulties in getting his number through directory assistance. He was informed that such a situation was not possible and that he was mistaken.

O'Bryan began taping telephone calls he made weekly to directory assistance, in which he usually was unable to receive his number. Armed with the tape recordings, O'Bryan again called the Bell office and was informed that such taping was illegal, and that he could seek other telephone service if he was dissatisfied with that provided by Bell. O'Bryan never personally took the tapes to the Bell office.

In September and October, 1973, and in 1974, O'Bryan again called to complain regarding lack of directory assistance, and further exchanges took place concerning the continuing failure to provide directory assistance.

In 1975 O'Bryan filed suit for damages based on Bell's failure to provide the College's number through the directory assistance operators during parts of 1973, 1974 and 1975.

At the trial O'Bryan produced testimony from several students and patrons of the College indicating they had been unable to receive a telephone number through directory assistance; an inability which had, on certain occasions, cost the College patronage.

Other testimony showed an average number of prospective beauty college students who contact colleges through directory assistance.

A vocational rehabilitation counselor testified he attempted to call the College in 1974 for the purpose of referring students to the College. Although he indicated a preference for the College because it taught bi-racial hair styling, his inability to get the telephone number through directory assistance caused him to refer ten students elsewhere in 1974. When he became aware the College was still in existence, he referred all his prospective beauty students there.

Finally, a certified public accountant testified concerning the income and expenses that the lost students would have generated, which caused a net loss in profits.

Bell introduced a tariff as evidence of its limited liability.

At the conclusion of the trial, the court made extensive Findings of Fact and the following Conclusions of Law and Judgment:

## CONCLUSIONS OF LAW

1. The law is with the Plaintiff and against the Defendant.

2. The Defendant breached its contract with the Plaintiff in that it failed to provide directory assistance service to the Plaintiff during the years, 1973, 1974 and 1975, by both failing to list the Plaintiff in the directory assistance listings and by failure to take reasonable steps to find the Plaintiff's listing so that callers to directory assistance were advised that no such listing existed for the Plaintiff entitling Plaintiff to actual damages as set out in the applicable tariff filed with the Public Service Commission of the State of Indiana.

3. That the acts and conducts of the Defendant established a common law tort committed against the Plaintiff.

4. That the acts and conduct of the Defendant were the result of one continuous wrong which did not completely

cease until the end of 1975 thereby tolling the Statute of Limitations applicable to actions founded in tort.

## JUDGMENT

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that the Plaintiff shall recover of and from the Defendant on the Claim for negligence the sum of Twenty-five thousand dollars ($25,000.00) and on the claim for breach of contract a sum equally [sic] the maximum amount recoverable on [sic] under the applicable tariff in force from March, 1973 to and including February, 1974.

## ISSUES

To aid in our discussion Bell's issues are restated as follows:

   I.   Was O'Bryan's recovery under the theory of negligence based upon sufficient evidence?

   II.   Did the trial court err in awarding a judgment upon the contract claim?

   III.   Did the trial court err in failing to make findings of fact upon certain issues?

   IV.   Were the damages awarded supported by sufficient evidence?

   V.   Did the trial court err in admitting over objection certain testimony of O'Bryan's witness, Jacobson?

   VI.   Did the trial court err in admitting into evidence plaintiff's Exhibits 3 and 5, which were tape recordings of telephone conversations?

### I.

*ISSUE ONE*—Was O'Bryan's recovery under the theory of negligence based on sufficient evidence?

---

1. The court made the following Findings of Fact:

   11.  The Defendant failed to list the Plaintiff with directory assistance until February, 1974 and on numerous occasions failed to provide the number to callers seeking it from directory assistance in a reasonable manner

*PARTIES' CONTENTIONS*—Bell contends that O'Bryan cannot recover under a tort theory because there was not sufficient evidence on all the necessary elements to prove negligence.

■ O'Bryan replies that he more than adequately established his case under a tort theory.

*CONCLUSION*—There was sufficient evidence to support a judgment that Bell was negligent in failing to provide directory assistance for O'Bryan.

*DUTY*—Bell owed a duty to O'Bryan to furnish directory assistance and incurred liability by virtue of a breach of that duty. The record discloses that O'Bryan stated specifically his need for his business to be listed in directory assistance, and that Bell orally assured him that the service would be provided.

Even were this not so Ind. Code 8–1–2–4 saddles Bell with a statutory duty to furnish reasonably adequate service and facilities. It is obligated to make a reasonable effort to honor all service commitments, 170 I.A.C. 7–1–22(4); and it is obligated to make reasonable efforts to prevent interruptions in its services and to re-establish the interrupted services as soon as possible. 170 I.A.C. 7–1–28. Directory assistance operators are required to have access to the telephone numbers for which they are responsible for furnishing directory assistance. 170 I.A.C. 7–1–23(5). From these rules of the Public Service Commission, and from its general responsibility as a public utility, a duty to provide adequate directory service is established by law.

*BREACH*—The evidence indicates a repeated pattern of failure to properly provide directory assistance despite O'Bryan's frequent complaints.[1] This may have been

once the listing was contained in the directory assistance book.

   12.  The Plaintiff first realized he was not listed with directory assistance or that customer calling directory assistance were not being given his number in March of 1973. He called directory assistance in the succeeding months on several occasions and asked

either due to Bell's failure to properly instruct and supervise the operators or its failure to properly prepare the operators' directory. Regardless, the same conduct constitutes a negligent breach of the statutory duty.[2]

*DAMAGES*—O'Bryan presented evidence of injury actually and proximately caused by the actions of Bell. This evidence showed that the College sustained financial loss by reason of Bell's failure to have the Beauty College's number available through directory assistance to prospective students and to persons who were in a position to refer prospective students to the College. Because negligence was established, O'Bryan was entitled to full recovery of compensatory damages for consequential injuries. *Prudential Insurance Co. v. Executive Estates* (1977), Ind.App., 369 N.E.2d 1117.

## II.

*ISSUE TWO*—Did the trial court err in awarding damages for O'Bryan's claim of breach of contract?

*PARTIES' CONTENTIONS*—Bell's position is that O'Bryan did not present sufficient evidence to establish his claim for breach of contract.

■ O'Bryan responds that the trial court properly awarded him damages under a theory of contract.

*CONCLUSION*—The trial court erred in awarding O'Bryan damages for breach of contract.

for the number of the Indianapolis Beauty College. The directory assistance operator would indicate no such listing existed. The Plaintiff would then call a service representative to complain about the fact that he was not listed with directory assistance and he would then be assured by the representative that the problem would be corrected. This routine continued over a period of several months.

15. The Defendant was negligent in failing to take reasonable steps to cause the Plaintiff to be listed in the books utilized by the directory assistance operators and to cause the directory assistance operators to search the listings in such a manner as to provide the number of the Indianapolis Beauty College when requested to do so by callers.

The trial court's award for breach of contract was based on the conclusion that a tariff introduced into evidence by Bell was applicable to the facts before it and supplied the proper measure of damages. This tariff provides:

> *The liability of the Telephone Company for damages arising out of mistakes, omissions, interruptions, delays, or errors or defects in transmission* occurring in the course of furnishing service, channels or other facilities and *not caused by the negligence of the customer or of the Telephone Company* in failing to maintain proper standards of maintenance and operation and to exercise reasonable supervision, shall in no event exceed an amount equivalent to the proportionate charge to the customer for the period of service during which such mistake, omission, interruption, delay, or error or defect in transmission occurs. (emphasis added.)

The explicit terms of the tariff establish that its purpose is to limit the liability of Bell for occurrences which are "not caused by the *negligence* . . . of the telephone company" (emphasis added). The trial court found, in a finding based on sufficient evidence (see Issue One, *infra*), that Bell was negligent. Thus this tariff is not applicable to these circumstances

The trial court erred in awarding contract damages based on a recovery pursuant to the inapplicable tariff, however, any er-

2. In its Findings of Fact no. 23 the court found that Bell's actions constituted negligence. Courts have found that similar conduct involving failure to make proper listing in published directories may constitute negligence. *Warner v. Southwestern Bell Telephone Company* (1968), Mo., 428 S.W.2d 596; *Allen v. Southern Bell Telephone and Telegraph Company* (1973), Fla.App., 285 So.2d 634; *Russell v. Southwestern Bell Telephone Company* (E.D.Tex.1955) 130 F.Supp. 130; *Hamilton Employment Service, Inc. v. New York Telephone Co.* (1930), 253 N.Y. 468, 171 N.E. 710; *Stein v. Diamond State Telephone Co.* (1929), 4 W.W.Harr. 185, 34 Del. 185, 146 A. 737.

ror by the trial court in doing so is harmless.

Although the trial court found that Bell had breached his contract to provide directory assistance, O'Bryan did not present at trial any injury which he had incurred because of this breach above and beyond those injuries which were compensated by way of the $25,000 recovery under the negligence theory.

■ O'Bryan's argument that he should recover under the contract the amount paid for the basic monthly service charge for March, 1973, through February, 1974, fails because there is no evidence in the record of the amount paid by O'Bryan to Bell for this period. To recover damages for breach of contract, the party asserting the breach has the burden of proving with reasonable certainty the damages which he incurred. *Daly v. Nau* (1975), 167 Ind.App. 541, 339 N.E.2d 71; *Bond v. Snyder Construction Co.* (1968), 142 Ind.App. 325, 234 N.E.2d 659.

Therefore, that part of the trial court's judgment which awards to O'Bryan damages "on the claim for breach of contract a sum equally [sic] the maximum amount recoverable on [sic] under the applicable tariff enforced from March, 1973, to and including February, 1974" must be reversed. It is "clearly erroneous". Appellate Rule 15(N). TR 52(A). The remainder of the judgment based on the theory of negligence is supported by sufficient evidence and is severable; therefore, it is affirmed. *See Charlie Stuart Oldsmobile, Inc. v. Smith* (1976), Ind. App., 357 N.E.2d 247, and cases cited therein.

### III.

*ISSUE THREE*—Did the trial court err in failing to make findings of fact upon certain issues?

*PARTIES' CONTENTIONS*—Bell next argues that it filed a request for findings of fact and the trial court's failure to make certain specific findings is grounds for reversal. O'Bryan replies that the findings were sufficient.

*CONCLUSION*—The trial court made adequate findings which were based on sufficient evidence.

■ If Bell was concerned that certain facts could not be found to exist it could have challenged the findings under TR 52(B). This it did not do. We will reverse only if the decision is not consistent with the findings and conclusions, or if the evidence is insufficient to support the decision. *Daly v. Nau, supra; In re the Marriage of Miles* (1977), Ind.App., 362 N.E.2d 171. The findings of fact must be considered as a whole and we may not reverse the judgment unless it is clearly erroneous. TR 52(A); *Pepka v. Branch* (1973), 155 Ind. App. 637, 294 N.E.2d 141.

Specifically Bell points to a failure to make a specific finding of fact as to proximate cause. The court ultimately found that Bell was negligent, and there was evidence demonstrating the existence of proximate cause, therefore we find no basis to reverse the trial court's decision.

Bell also challenges the trial court's failure to make a specific finding as to the assessment of the damages. Finding No. 21 did set out that each student produced for the school a net profit based on the services performed for customers and tuition charged by the College. Finding No. 22 states that the College was damaged by the loss of students.[3] The judgment is supported by these findings and the evidence in the record details the amounts involved. Again we find no basis to reverse the trial court's decision.

### IV.

*ISSUE FOUR*—Were the damages awarded supported by sufficient evidence?

---

**3.** The findings state:

21. Each student that attended the Plaintiff's school on a full-time basis produced for the Plaintiff a net profit to the school, based on the amount of service performed on customers of the Plaintiff, less the expenses attributable to operating the Plaintiff's business, plus tuition charged by the Plaintiff.

22. The Plaintiff has been damaged in the years, 1973, 1974 and 1975 by the loss of students.

*PARTIES' CONTENTIONS*—Bell contends that O'Bryan's evidence was insufficient to measure the profits claimed to be lost.

■ O'Bryan responds that the evidence was sufficiently probative and specific to clearly show damages in the form of lost profits from a loss in tuition and shop income.

*CONCLUSION*—There is sufficient evidence in the record to support the award of $25,000.

■ For negligence suffered, the plaintiff is entitled to damages for the injuries proximately caused by the breach of the duty owed to him. *Jay Clutter Custom Digging v. English* (1979), Ind.App., 393 N.E.2d 230; *Ogle v. Wright* (1977), Ind. App., 360 N.E.2d 240; *Jerry Alderman Ford Sales, Inc. v. Bailey* (1972), 154 Ind.App. 632, 291 N.E.2d 92.

■ In general, no particular degree of mathematical certainty is required in awarding damages. *Friendship Farms Camps, Inc. v. Parson* (1977), Ind.App., 359 N.E.2d 280; *Jay Clutter Custom Digging, supra*. Loss of profits is admissible as a measure of damages if the amount of loss can be ascertained with a relative degree of certainty and based upon proper evidence. *Kroger Company v. Haun* (1978), Ind.App., 379 N.E.2d 1004; *Wolff v. Slusher* (1974), 161 Ind.App. 182, 314 N.E.2d 758; *Indianapolis Railways, Inc. v. Terminal Motor Inn, Inc.* (1953), 124 Ind.App. 1, 112 N.E.2d 596.

O'Bryan's witness, a vocational rehabilitation counselor for the State of Indiana, testified that he would have sent ten specific students to the College in early 1974 but for the fact that he was unable to obtain the College's telephone number from directory assistance. At that time the tuition charge was $550.00.

O'Bryan next established that the gross income from working in the College's beauty shop that each of these lost students would have generated during their instruction period was $2,860.00. O'Bryan's witness, a certified public accountant, then established that the expenses generated by each student was $1,000.00.

The vocational rehabilitation counselor testified that seven of the eight to ten students referred elsewhere by him did graduate. Thus the court could reasonably and conservatively conclude that $16,850.00 in net profits was lost to the College.[4]

O'Bryan also introduced the testimony of Ann Hill, an investigator for the Indiana State Beauty Board; for fifteen years she had been responsible for recruiting and enrolling students from various beauty colleges. From her experience she indicated that fifty percent of the students contacted a school initially as a result of utilizing directory assistance. Tamara Barfell, director of another Indianapolis beauty college, testified that fifty to seventy-five percent of her enrolled students first contacted her school by use of the telephone, and of this number thirty percent first called directory assistance.

From the evidence the court could have decided that, because of the difficulty in receiving the College's number through directory assistance, there was a twenty-five percent loss of students who would have completed the curriculum during the 1973 through 1975 period. Twenty-five percent of the eighteen students who did graduate in those years indicates a loss of 4.5 graduates and a resulting loss in net profits from shop activities of approximately $8,000.[5]

These damages total $24,850.00 in lost net profits.

The damages awarded based upon lost profits was within the scope of the evidence presented to the trier of fact. This evidence did show the amount of profits lost through decreased enrollment with a reasonable degree of certainty. *Jerry Alderman Ford Sales, Inc., supra; Indianapolis*

---

4. This amount includes $550 lost tuition plus $2,850 lost shop income, less $1,000 in expenses per student, multiplied by the seven students who would have graduated.

5. This amount includes $2,860 income less $1,000 in expenses, multiplied by the 4.5 graduates. It does not consider any revenue for tuition from these students.

*Railways, Inc., supra; Ogle v. Wright, supra; Friendship Farms Camps, Inc., supra.*

## V.

*ISSUE FIVE*—Did the trial court err in admitting over objection certain testimony of O'Bryan's witness, Jacobson?

*PARTIES' CONTENTIONS*—Bell next contends that the trial court erred in failing to strike the testimony of O'Bryan's accountant, Bruce Jacobson, on the grounds that the testimony was based upon facts not in evidence.

■ O'Bryan says that all facts were eventually properly admitted into evidence.

*CONCLUSION*—All facts relied upon to measure the damages were properly admitted.

The testimony of Ann Hill and Tamara Barfell showed that in their experience an average of thirty to fifty percent of students who enrolled used directory assistance to contact beauty colleges. From this estimate, O'Bryan concluded, in general, twenty-five percent of students who graduate would have first contacted their schools through directory assistance. That there were eighteen graduates at O'Bryan's college during the time period of inadequate directory assistance is undisputed. Jacobson, his accountant, then computed that twenty-five percent of the eighteen graduates multiplied by the net profits per graduate (an amount already established in evidence) established the net profits lost to the College.

In the case quoted by Bell in support of its argument the facts in evidence upon which the damage award therein was based, consisted of items whose values should have been excluded from the amount awarded. *Indianapolis Railway, Inc. v. Terminal Motor Inn, Inc.* (1953), 124 Ind.App. 1, 112 N.E.2d 596. In that case, because no evidence was ever introduced itemizing individual parts, the improper values could not be subtracted and the total award was erroneous.

In this case there was evidence from which the lost profits could be computed by O'Bryan's witness accountant Jacobson, as a basis for the damage award. Objection to such testimony was properly overruled.

## VI.

*ISSUE SIX*—Did the trial court err in admitting into evidence plaintiff's Exhibits ·3 and 5, which were tape recordings of telephone conversations?

*PARTIES' CONTENTIONS*—As its final contention Bell argues that Exhibits 3 and 5 (tape recordings) were erroneously admitted by the trial court because they were re-recordings · and not the original tapes.

■ O'Bryan responds that the proper foundation was laid for the introduction of the tape recordings and that Bell's objections were merely to the weight to be given to the material found on the tapes.

*CONCLUSION*—Even though the exhibits were re-recordings, a proper foundation was laid and they were properly admitted by the trial court.

At the trial O'Bryan testified at length as to how, when and where the tapes were made, the identity of the parties, in whose custody they had been held, and that they accurately reflected his conversations with Bell employees. And he was cross-examined.

■ Indiana law requires that the admission of a sound recording in a civil case should be proceeded by a foundation disclosing:

1. That it is authentic and correct;

2. That the testimony elicited was freely and voluntarily made without any kind of duress;

3. That it does not contain matter otherwise not admissible into evidence; and

4. That it is of such clarity as to be intelligible and enlightening to the jury.

*Lamar v. State* (1972), 258 Ind. 504, 282 N.E.2d 795; *Jackman v. Montgomery* (1974), 162 Ind.App. 558, 320 N.E.2d 770;

*Gibbs v. Miller* (1972), 152 Ind.App. 326, 283 N.E.2d 592.

An informative statement as to authenticity is contained in *Lamar*, 258 Ind. at 507, 282 N.E.2d at 797:

> Without reflecting upon the complexities of tape recording devices or their degree of proficiency at that time, they are in common use today, relatively simple of operation and heavily used and relied upon for innumerable purposes. The tape speaks for itself with regard to its audibility. If it is of adequate quality in this regard, it is immaterial how it became so; and there is no more reason for inquiring into the specifications of the device which recorded it and the capabilities of the person who operated it than there would be to make similar inquiries concerning the camera, the film, the developing and printing processes and the technician who produced a photograph before admitting it into evidence. All that is required is a showing that the photograph is an adequate representation of that which is intended to be portrayed. We see no reason for requiring more of a sound recording.

The thrust of Bell's position is that the tapes were not properly authenticated because they were not admissible under the best evidence rule since they were composited and edited re-recordings of several tapes.

The best evidence rule is preferential, not exclusionary, and as commonly stated,

> prohibits introduction in evidence of a copy of a document or writing unless and until the absence of the original is accounted for on some reason other than the serious fault of the proponent. The purpose of the rule is to insure trustwor-

thiness. In earlier times a "copy" was a handmade reproduction. It was amenable not only to deliberate falsification but to Scriveners error and, in some instances, a "sure" recollection which was in fact not sure at all.

*Wilson v. State* (1976), Ind.App., 348 N.E.2d 90, 94. In that opinion this court followed the position of the Federal Rules of Evidence, Rules 1001–1003 [6] as they related to written documents. Speaking for this court, Judge Garrard logically concluded that:

> a "duplicate" of a document or other writing is a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical, electric or chemical reproduction or other equivalent technique which accurately reproduces the original. Such duplicates are admissible in evidence to the same extent as an original unless a genuine issue is raised as to the authenticity of the original, or under the circumstances existing it would be unfair to admit the duplicate as an original.

348 N.E.2d at 95. (Footnotes omitted.)

This logic should apply to tape recordings and re-recordings. But there is no Indiana authority on point. Federal law, however, comes to our rescue.

In *United States v. Knohl* (2d Cir. 1967), 379 F.2d 427, 440, the Second Circuit Court of Appeals was confronted with a similar situation:

> Where a re-recording of a tape recorded conversation is offered in evidence and

---

**6.** Rule 1001. Definitions. For purposes of this article the following definitions are applicable:

. . . . .

(4) Duplicate.—A "duplicate" is a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduce the original.

Rule 1002. Requirement of Original. To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress. Rule 1003. Admissibility of Duplicates. A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.

the trier finds that a proper foundation has been laid for it, and that the re-recording is authentic and accurate, *a technical and rigorous application of the best evidence rule makes no sense and is not required.* Johns v. United States, 323 F.2d 421 (5 Cir. 1963). The discussion of the rule by Mr. Justice Sutherland, sitting as a Circuit Justice in the Second Circuit, in *United States v. Manton*, 107 F.2d 834, 845 (2 Cir. 1939) is pertinent:

> "The rule is not based upon the view that the so-called secondary evidence is not competent, since, if the best evidence is shown to be unobtainable, secondary evidence at once becomes admissible. And if it appear, as it does here, that what is called the secondary evidence is clearly equal in probative value to what is called the primary proof, and that fraud or imposition, reasonably, is not to be feared, the reason upon which the best evidence rule rests ceases, with the consequences that in that situation the rule itself must cease to be applicable, in consonance with the well established maxim—cessante ratione legis, cessat ipsa lex. . . ."

We are not unmindful, however, that tape recordings are susceptible to alteration and that they often have a persuasive, sometimes a dramatic, impact on a jury. *It is therefore incumbent on the Government to produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings; and where the court accepts them as authentic and accurate but the evidence is conflicting on these points, it must caution the jury to scrutinize the evidence with care.* (emphasis supplied.)

Other cases found that re-recordings, like tape recordings, were often more reliable than the memories of the participants to the conversation, and therefore were the best evidence of the conversation. *People v. Porter* (1951), 105 Cal.App.2d 324, 233 P.2d 102; *People v. Stephens* (1953), 117 Cal.App.2d 653, 256 P.2d 1033; *People v. Wojahn* (1959), 169 Cal.App.2d 135, 337 P.2d 192; [7]

In a 5th Circuit case, *United States v. Conway* (5th Cir. 1975) 507 F.2d 1047, the original telephone tape made by the government was not produced. Part of an edited duplicate tape, which omitted five of the eleven separate conversations that had been all or partially erased, was admitted. The appellant contended that the admission of the tape in such a confused state violated the best evidence rule. Initially, the court reiterated that it had constantly held that the best evidence rule applied only to writings. The court held, moreover, that there was no evidence nor intimation that the erasures were intentional, the authenticity of the tape was unquestioned, the tape was relevant, trustworthy, of probative value, and therefore properly admitted.

Thus cases decided before promulgation of the Federal Rules of Evidence held that an objection that a tape recording was a re-recording presented no question as to its authenticity or correctness and it was no less admissible than the original version upon clear and convincing proof of authenticity and accuracy. The trial courts were vested with broad discretion in determining the probative value of recorded conversations and a decision to admit recordings or re-recordings was not reversed without a clear showing of abuse. *Knohl, supra; Wilson v. Rooney* (1958), Fla.App., 101 So.2d 892.

---

**7.** Re-recordings have also been accepted if: bringing a large machine to play the original recording would have been an inconvenience to the court, *Harman v. State* (1976), Okl.Cr., 556 P.2d 1326; *see also United States v. Riccobene* (1970 E.D.Pa.) 320 F.Supp. 196; a re-recording was made more audible through the use of a noise suppressor, *Fountain v. United States*

(5th Cir. 1967) 384 F.2d 624; *People v. Porter, supra*; or if the original was not audible because of some other mechanical difficulty. *People v. Marcus* (1973), 31 Cal.App.3d 367, 107 Cal.Rptr. 264; *United States v. Knohl, supra*; Annot., 58 A.L.R.3d 594 (1974). These cases found admission of re-recordings did not violate the best evidence rule.

The Federal Rules of Evidence became effective July 1, 1975.

In *United States v. Denton* (6th Cir. 1977) 556 F.2d 811, the appellant argued that the original tapes of the intercepted telephone conversations should have been played at trial, rather than the composite tape which was made up of elements of other tapes and had been edited to make it a composite. The trial court relied on Fed.R.Evid. 1006[8] to admit the "summary" of the taped conversations. The Court of Appeals reviewed numerous cases in which the admissibility of recordings of intercepted conversations, or parts thereof, was a matter committed to the sound discretion of the trial court. In *United States v. Denton, supra,* (and *United States v. DiMuro* (1st Cir. 1976) 540 F.2d 503) the appellant did not offer any proof questioning the accuracy or authenticity of the edited and composite tapes or in fairness in their use.

Under Fed.R.Evid. 1003 a duplicate recording is admissible *to the same extent* as the original unless a question is raised as to the authenticity of the original or circumstances indicate that it would be unfair to admit the duplicate. Then a specific objection indicating why the original is needed is required. *See* J. B. Weinstein and M. A. Berger, Evidence (1978): *Johns v. United States* (5th Cir. 1963) 323 F.2d 421. There is no longer the *Knohl* requirement of a "clear and convincing" showing of the trustworthiness of the re-recording.

As the Indiana Supreme Court observed in *Lamar,* the accuracy and authenticity of a tape recording is not a technological problem anymore. The same may be said for the mechanics of re-recordings.

When a duplicate tape recording is offered the federal rules require the proponent to establish no more foundation than would be required for the original tape. We find the provisions of Fed.R.Evid. 1001–1003 and the holding of *Wilson* equally proper when applied to re-recordings. Therefore, a "duplicate" is also a mechanical or electronic re-recording.[9]

Bell also objected to the tapes because a typist erased portions of the tapes, he did not label the tapes immediately, and the tapes were not in his immediate custody on two occasions. Bell does not argue, however, that the tapes do not accurately represent what O'Bryan claims them to be, in other words, that they are not authentic and correct.

Bell does not argue that material portions have been omitted, making the remainder an incorrect or misleading representation of what occurred, nor that parts omitted would supply different or additional information material to the issues. Bell makes no intimation of fraud, that the erasures were intentional, that the tapes were intentionally altered, that the re-recordings (or recordings) were improperly prepared, or any other grounds that the duplicate recordings are not trustworthy. Even before the Federal Rules were applicable, unless the *content* was at issue, the best evidence rule did not come into play. *People v. Marcus, supra.*

The admissibility of recordings of intercepted conversations or parts thereof was a matter committed to the sound discretion of the trial court. Bell has not demonstrated that the trial court abused this discretion.

We affirm the judgment as to the $25,000 recovery for negligence but reverse it insofar as it allows recovery for breach of contract.

SHIELDS and SULLIVAN, JJ., concur.

8. Fed.R.Evid. 1006 provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

9. *See* Fed.R.Evid. 1001(4) in footnote 12, *supra.*